IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

NANCY S. THORNTON,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

Defendant.

No. C13-2038

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.   Thornton's Education and Employment Background . . . . . . . . . . . 5
      B.   Administrative Hearing Testimony . . . . . . . . . . . . . . . . . . . . . . 5
           1.   Thornton's Testimony . . . . . . . . . . . . . . . . . . . . . . . . 5
           2.   Vocational Expert's Testimony . . . . . . . . . . . . . . . . . . . 7
      C.   Thornton's Medical History . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.    CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . . . . 14
      B.   Objections Raised By Claimant . . . . . . . . . . . . . . . . . . . . . . . 17
           1.   Dr. Rathe's Opinions . . . . . . . . . . . . . . . . . . . . . . . . 17
           2.   RFC Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.  ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Nancy S. Thornton on May 20, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Thornton asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Thornton requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On August 31, 2009, Thornton applied for both disability insurance benefits and SSI benefits. In her applications, Thornton alleged an inability to work since June 20, 2005 due to diabetes, high blood pressure, flat feet, depression, hip dysplasia, and diverticulitis. Thornton's applications were denied on December 21, 2009. On April 13, 2010, her applications were denied on reconsideration. On June 23, 2010, Thornton requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 6, 2011, Thornton appeared via video conference with her attorney before ALJ Jeffrey Marvel for an administrative hearing. Thornton and vocational expert Elizabeth M. Albrecht testified at the hearing. In a decision dated December 9, 2011, the ALJ denied Thornton's claims. The ALJ determined that Thornton was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Thornton appealed the ALJ's decision. On March 20, 2013, the Appeals Council denied Thornton's request for review. Consequently, the ALJ's December 9, 2011 decision was adopted as the Commissioner's final decision.

On May 20, 2013, Thornton filed this action for judicial review. The Commissioner filed an Answer on September 19, 2013. On November 4, 2013, Thornton

filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing other work that exists in significant numbers in the national economy. On January 8, 2014, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On January 21, 2014, Thornton filed a reply brief. On October 24, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

3

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary

outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Thornton's Education and Employment Background

Thornton was born in 1957. She is a high school graduate. After high school, Thornton attended two years of college. At the administrative hearing, she also testified that she earned two technical degrees in cosmetology and massage therapy.

The record contains a detailed earnings report for Thornton. The report covers the time period of 1973 to 2010. Prior to 1977, Thornton had minimal earnings, ranging from no earnings to $220. From 1977 to 1979, Thornton earned $1,841.77 (1977), $5,907.81 (1978), and $2,451.75 (1979), respectively. She had no earnings in 1980. In 1981, she earned $1,469.50, and $485.00 in 1982. She, again, had no earnings in 1983. From 1984 to 1990, Thornton earned between $72.00 (1988) and $7,637.97 (1986). Then from 1991 to 1996, she, again, had no earnings. From 1997 to 2002, she earned between $899.07 (2002) and $23,545.47 (2001). Once again, she had no earnings from 2003 to 2008. In 2009, she earned $8,219.67. She has no earnings since 2010.

### B. Administrative Hearing Testimony

#### 1. Thornton's Testimony

At the administrative hearing, the ALJ asked Thornton to describe the health problems that she believes causes her to be unable to work. Thornton responded that she is unable to work due to exhaustion, neuropathy in her feet and hands, and pain in her legs, back, and neck. Thornton also discussed her mental health difficulties. She stated that she is bipolar, and has difficulties with anxiety, agoraphobia, and panic attacks. Regarding the bipolar disorder, Thornton testified that:

I . . . have depression, more so, now that I've gotten older
than I have the mania. I still have some -- will go through
cycles with the mania. And when I'm manic, I don't sleep.
I stay up -- you know, I stay up all night. And then when I go
in to depression, I'll -- I don't like to leave the house. I don't
like people to see me. I don't -- just want to just stay at the
house, and I can't leave.

(Administrative Record at 42-43.) Thornton also testified that due to her mental health
issues, she has some memory problems, including remembering dates and time.

Thornton's attorney also questioned Thornton. Thornton's attorney inquired about
her functional abilities:

Q: How long can you stand without taking a break?
A: Probably 15-20 minutes. . . .
Q: How about sitting? Can you sit?
A: I can sit a little bit longer than I can stand, but if I sit,
my -- my left leg starts to [get] pain in my calf. And
then my right leg is also having -- starting to have pain
up behind my knee and up into my thigh. . . .
Q: Could you -- could you lift 20 pounds today on a
continuous basis or frequent basis?
A: No.
Q: How much do you think you could lift on a frequent
basis?
A: I would --
Q: 10 pounds or less?
A: Less.
Q: Do you have problems with bending or kneeling or
stooping or crawling?
A: Yes.
Q: What problems do you have with those things?
A: Well, my left leg is so stiff that it -- and my left ankle
is so stiff that, like, to get down on the floor or to bend
that I have -- I have trouble. I -- like, if I -- if I get
down on the floor, I have to have help getting up.
Q: Do you have problems with balance?
A: I have a lot of problems with balance.
Q: What problems do you have?

6

> A:      Well, I'm -- I'm not steady. I teeter. I'm always afraid
>         to fall because I can't feel the bottom of my feet.

(Administrative Record at 53-55.) Lastly, Thornton's attorney asked Thornton why she believed she was incapable of working. Thornton responded that she could not work because she has "trouble standing and when -- like, if I like stand for a short period of time, my feet swell up. And I don't like to be around people. And I have trouble getting along with my coworkers. And I'm afraid to be out in public."[1]

### 2.    *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Elizabeth M. Albrecht with a hypothetical for an individual who:

> could occasionally lift 20 pounds and frequently lift 10 pounds;
> could stand and walk for six hours out of an eight-hour day
> and sit for six hours out of an eight-hour day; who could
> occasionally balance, stoop, crouch, kneel, crawl, and climb;
> who should avoid jobs with no -- who cannot perform jobs
> with close attention to detail; cannot use independent
> judgment; can have only occasional contact with the public,
> coworkers, or supervisors.

(Administrative Record at 63-64.) The vocational expert testified that under such limitations, Thornton would be precluded from performing her past relevant work. The vocational expert determined, however, that Thornton could perform the following jobs: (1) assembler of small products (4,200 positions in Iowa and 227,000 positions in the nation), (2) marker (2,500 positions in Iowa and 213,000 positions in the nation), and (3) laundry folder (800 positions in Iowa and 86,000 positions in the nation). The ALJ provided the vocational expert with a follow-up hypothetical question:

> Q:      If we added to that hypothetical that this individual
>         would miss more than two days of work per month,
>         would need to take more than two unscheduled breaks

---

[1] Administrative Record at 61.

per day, and would work at a slow pace for up to a third of the day, would there be any jobs in the competitive economy that such an individual could perform?

A:    If you would add to any hypothetical that the individual could miss -- would miss two or more days a month of work, require two unscheduled breaks, or work at a slow pace, either of those by themselves or all together would preclude all competitive employment.

(Administrative Record at 65.)

### C. Thornton's Medical History

On January 9, 2006, Thornton met with Robert M. Welshons, PA-C, for a consultative examination. Welshons reviewed Thornton's medical history and noted that she recently had colon surgery to treat diverticulitis. Welshons also noted a history of diabetes. In reviewing Thornton's activities of daily living, Welshons indicated that "she has some trouble getting into and out of the tub at times because of the left hip. She estimates she can stand about 30 minutes and sit about 45 minutes before she begins to get some discomfort in the left thigh."[2] Upon examination, Welshons diagnosed Thornton with diabetes, hypertension, peripheral neuropathy, and depression. Welshons concluded that:

> [Thornton] does see local physicians for her medical conditions but is likely not compliant with her medication. She admits disliking having to take medication and to forgetting her medication this morning. . . . She may well have developed some peripheral neuropathy from the diabetes, especially if her diabetes is not in good control, and while it seems fairly mild to this point, it will probably worsen over time. . . . She would be able to stoop and kneel. . . .
>
> Her physical findings are fairly routine today. It is quite possible that depression is overlying her physical symptoms,

---

[2] Administrative Record at 426.

worsening them, and in fact may be more disabling than her
physical and medical conditions. . . .

(Administrative Record at 427.)

On February 3, 2006, Thornton was referred by Disability Determination Services ("DDS") to Dr. Paul M. Conditt, Psy.D., for a psychodiagnostic disability examination. Thornton told Dr. Conditt that she was applying for disability benefits because " 'I've been depressed on and off my whole life. I'm not sleeping, I am very sad, I cry all the time, I don't like being in public. When I get angry, I can't control it. My self-esteem is very low." [3] Upon examination, Dr. Conditt diagnosed Thornton with bipolar disorder, and assigned her a GAF score of 46. Dr. Conditt opined that: (1) Thornton can understand instructions, procedures, and locations without impairment; (2) depending on her mood, Thornton would have difficulty carrying out instructions and maintaining concentration and pace when depressed or manic; (3) when irritable, Thornton can be explosive and yell at others making her ability to interact appropriately with supervisors, co-workers, and the public dependent upon her mood; and (4) her ability to use good judgment and respond appropriately to changes in the work place is mood dependent.

On February 9, 2006, Thornton was referred by her counselor to Covenant Clinic Psychiatry, in Waterloo, Iowa, for treatment. Thornton reported to Dr. Sunita Kantamneni, M.D., that she had a long history of depression, and was recently diagnosed with bipolar disorder. Thornton also reported that she had been prescribed multiple medications as treatment, but experienced limited improvement using the medications. Upon examination, Dr. Kantamneni diagnosed Thornton with bipolar disorder, and assigned her a GAF score of 45. Dr. Kantamneni recommended medication as treatment.

On February 22, 2006, Dr. Richard H. Hornberger, M.D., reviewed Thornton's medical records and provided DDS with a physical residual functional capacity

---

[3] *Id.* at 431.

("RFC") assessment for Thornton. Dr. Hornberger determined that Thornton could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Hornberger found no postural, manipulative, visual, communicative, or environmental limitations. Dr. Hornberger concluded that "[t]he total body of medical evidence indicates [Thornton] is obese and may have some mild neuropathy. [She] is capable of performing a full range of light work activities."[4]

Also, on February 22, 2006, Dr. M. Jane Bibber, Ph.D., reviewed Thornton's medical records and provided DDS with a Psychiatric Review Technique assessment for Thornton. Dr. Bibber diagnosed Thornton with bipolar syndrome. Dr. Bibber determined that Thornton had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Bibber concluded that "[s]ince [Thornton] has not obtained effective treatment with a mental health care provider, but has adequate mental daily functioning according to her Function Report, we find that the [medically determinable impairment] is not severe."[5]

On September 5, 2006, Dr. Laura Griffith, D.O., reviewed Thornton's medical records and provided DDS with a physical RFC assessment for Thornton. Dr. Griffith determined that Thornton could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations.

---

[4] Administrative Record at 445.

[5] Administrative Record at 458.

Dr. Griffith also determined that Thornton could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Griffith found no manipulative, visual, communicative, or environmental limitations.

On October 3, 2006, Dr. Sandra Davis, Ph.D., reviewed Thornton's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Thornton. On the Psychiatric Review Technique assessment, Dr. Davis diagnosed Thornton with bipolar syndrome. Dr. Davis determined that Thornton had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Davis determined that Thornton was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Davis concluded that:

> In summary, [Thornton] has variable attention, concentration, and pace which is somewhat mood dependent. She has some irritability and may be distractible and easily angered. She will not do well with intense contacts with the general public and my be sensitive to supervisory criticism. She will have trouble with rapid or complex change.
>
> The medical evidence is generally consistent. [Thornton's] allegations are credible to the extent she has some work-related limitations, as outlined above.

(Administrative Record at 549.)

On October 20, 2009, at the request of DDS, Dr. Conditt performed a second psychodiagnostic disability examination for Thornton. Dr. Conditt noted that Thornton had been "treated for bipolar and depression in the past, but has not taken any medication since last June when she ran out and cannot afford any."[6] Dr. Conditt described Thornton's bipolar disorder as follows:

> Her mood rapidly cycles between depression, where she will sleep a lot, isolate herself, and have a very pessimistic outlook, to manic, where she gets extremely irritable and will stay up for hours at a time and even all night.

(Administrative Record at 642-643.) Upon examination, Dr. Conditt diagnosed Thornton with bipolar disorder, and assigned a GAF score of 50. Dr. Conditt opined that Thornton's concentration varies based on her mood, pace is limited by her physical functioning, irritability affects her interaction with others, and she has a history of poor decision-making when manic. Dr. Conditt concluded that:

> [Thornton's] manic states are moving more towards irritability[.] . . . The depression is worsening in intensity. If she gets on proper medication, these issues could improve, although she will always struggle with them. Her health issues will probably continue to get worse as she ages.

(Administrative Record at 644-645.)

On November 2, 2009, Dr. Scott Shafer, Ph.D., reviewed Thornton's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Thornton. On the Psychiatric Review Technique assessment, Dr. Shafer diagnosed Thornton with bipolar disorder. Dr. Shafer determined that Thornton had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration,

---

[6] Administrative Record at 642.

persistence, or pace. On the mental RFC assessment, Dr. Shafer determined that Thornton was moderately limited in her ability to: maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. Dr. Shafer concluded that:

> [Thornton] retains the ability to understand, remember, and follow instructions. Her attention, concentration, and pace are adequate for tasks not requiring sustained attention. She can interact appropriately with the public, coworkers, and supervisors on at least a superficial level. Her judgment is adequate to adjust to changes in the workplace.

(Administrative Record at 722.)

On December 21, 2009, Dr. Rene Staudacher, D.O., reviewed Thornton's medical records and provided DDS with a physical RFC assessment for Thornton. Dr. Staudacher determined that Thornton could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Staudacher also determined that Thornton could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Staudacher found no manipulative, visual, communicative, or environmental limitations.

On September 1, 2011, at the request of Thornton's attorney, Dr. Ann Rathe, M.D., a treating psychiatrist, filled out "Mental Impairment Interrogatories" for Thornton. Dr. Rathe diagnosed Thornton with bipolar disorder, generalized anxiety disorder, and panic disorder. Dr. Rathe assigned Thornton a GAF score of 45, with a high score of 50 in the past year. Dr. Rathe indicated that Thornton's signs and symptoms included: poor

memory, sleep disturbance, personality change, mood disturbance, emotional lability, difficulty thinking or concentrating, social withdrawal and isolation, decreased energy, manic syndrome, and generalized persistent anxiety. Dr. Rathe opined that Thornton "would be unable to hold a job, due to lack of insight into appropriate behaviors and appearance in a work setting."[7] Dr. Rathe indicated that Thornton's prognosis was poor because she has a "chronic mental illness." Dr. Rathe estimated that Thornton would be absent three or more days from work each month due to her impairments or treatment for her impairments. Dr. Rathe found that Thornton would not be able to perform the following work functions on a regular, reliable, and sustained schedule: maintaining attention and concentration for extended periods of time, maintaining regular attendance, being punctual within customary tolerances, working in coordination with or proximity to others without being distracted by them, completing a normal workday or workweek, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting. Dr. Rathe determined that Thornton had the following limitations: moderate restriction of activities of daily living, extreme difficulties in maintaining social functioning, and constant difficulties in maintaining concentration, persistence, or pace.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Thornton is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir.

---

[7] Administrative Record at 761.

2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant

work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Thornton had not engaged in substantial gainful activity since June 20, 2005. At the second step, the ALJ concluded from the medical evidence that Thornton has the following severe impairments: obesity, diabetes with associated neuropathy, bipolar disorder, generalized anxiety disorder, panic disorder with agoraphobia, and a history of alcohol and cocaine dependence in remission. At the third step, the ALJ found that Thornton did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Thornton's RFC as follows:

> [Thornton] has the residual functional capacity to perform light work . . . lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking six hours of an eight-hour workday, and sitting six hours of an eight-hour workday. She can only occasionally balance, stoop, kneel, crouch, crawl, or climb. Moreover, [Thornton] cannot perform jobs requiring close attention to detail. She would be unable to exercise independent judgment. Finally, she may have only occasional contact with the public, co-workers, or supervisors.

(Administrative Record at 16.) Also at the fourth step, the ALJ determined that Thornton was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Thornton could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Thornton was not disabled.

## B. Objections Raised By Claimant

Thornton argues that the ALJ erred in two respects. First, Thornton argues that the ALJ failed to properly evaluate the opinions of Dr. Rathe, her treating psychiatrist. Second, Thornton argues that the ALJ's RFC is flawed because the ALJ found that her severe impairments included diabetic neuropathy, but failed to include any meaningful limitations in her ability to stand, walk, or handle in his RFC assessment.

### 1. Dr. Rathe's Opinions

Thornton argues that the ALJ failed to properly evaluate the opinions of her treating psychiatrist, Dr. Rathe. Specifically, Thornton argues that the ALJ's reasons for discounting Dr. Rathe's opinions are not supported by substantial evidence in the record. Thornton concludes that this matter should be remanded for further consideration of Dr. Rathe's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's

17

statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id.*.); *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear

to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In his decision, the ALJ addressed Dr. Rathe's opinions as follows:

> The undersigned acknowledges the opinion of Anne Rathe, M.D., but her conclusions of moderate restriction in activities of daily living, extreme difficulties in social functioning, constant deficiencies [in] concentration, persisten[ce], or pace, and continual episodes of decompensation are not only contrary to the opinions of the consultative examiners who evaluated [Thornton], but also the above-described activities of daily living indicative of far less limitation. Furthermore, [Thornton's] treatment history with Dr. Rathe dates to only December 2010--less than a year prior to this decision. Additionally, [Thornton] has long periods of non-treatment for her mental health issues in her medical history. Taken together, these factors undermine the opinion of Dr. Rathe.

(Administrative Record at 20.) Also pertinent to the ALJ's consideration of Dr. Rathe's opinions, is the ALJ's longitudinal discussion of Thornton's history of mental health treatment:

> Although claiming an onset date in June 2005, [Thornton] did not seek treatment for any mental impairment until after Paul Condit[t], Psy.D., the psychological consultative examiner diagnosed bipolar disorder in February 2006. After that evaluation, [Thornton] established psychiatric care with her primary provider, Sunita Kantamneni, M.D., who confirmed her bipolar disorder. He prescribed Lamictal, which [Thornton] reported made her feel a little better without side effects at her follow-up appointment. By mid March 2006, [she] reported that she was doing well without concerns and that her anger outbursts had decreased in severity. [Thornton's] follow-up appointments with Dr. Kantamneni continued through April, but ceased thereafter. In fact, [Thornton's] next interaction with a mental health professional was her second consultative examination with Dr. Conditt in October 2009--over three years later.

During that encounter, [Thornton] described many of her social and daily activities. These included spending time at the University of Northern Iowa using their computers, attending political party events, and going to church, which organizes events in her hometown. . . . Moreover, [her] function report indicates she cares for her children, has no problem dressing, shaving, feeding herself, or using the toilet. She also can cook, clean her room, drive her car to shop for groceries three times per week, read, complete crafts and puzzles, go to the library, and play cards.

Not only does the breadth of such activity suggest minimal limitation in her activities of daily living, but also suggests any restrictions she experiences in her social functioning and concentration, persistence, or pace are no more than moderate in nature. . . . [A]ctivities such as political party and church participation suggest no more than moderate limitations in social functioning, and hobbies such as crafts, puzzles, and playing cards show she similarly suffers only moderate restriction with regard to her concentration, persistence, or pace.

Even considering [Thornton] reestablished psychiatric care in December 2010 with the additional diagnosis of generalized anxiety disorder, the above-described activities, her long gaps in treatment, the lack of outpatient counseling, as well as documented success of pharmacological therapy, suggest the above-listed residual functional capacity assessment fully accounts for her mental impairments.

(Administrative Record at 19-20.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Rathe. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Rathe's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the

conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## 2. RFC Assessment

Thornton argues that the ALJ's RFC assessment is not supported by substantial evidence in the record because the ALJ failed to consider all of her functional limitations. Specifically, Thornton argues that in making his RFC assessment, the ALJ failed to address and consider all of the medical evidence in the record which supports significant functional limitations caused by her diabetic neuropathy, including limitations on her ability to stand, walk, and handle. Thornton maintains that this matter should be remanded for further consideration of her RFC.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697(citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

In his decision, the ALJ thoroughly addressed Thornton's difficulties with diabetes, including her diabetic neuropathy.[8] For example, the ALJ noted that "Dr. Steinke found [Thornton] capable of doing 'most routine activities such as sitting and standing and walking,' and he opined she would be able to stoop and kneel. Moreover, Dr. Steinke's other observations indicated little or no effect from [Thornton's] diabetes and neuropathy."[9] Similarly, the ALJ pointed out that Dr. Michael Nguyen, M.D., found Thornton capable of handling most daily activities. Dr. Nguyen also noted that Thornton was not compliant in taking her diabetes medicine.[10] The ALJ also noted that Thornton's medical history contained considerable gaps in treatment for her diabetes and neuropathy.[11] The ALJ concluded that:

> Given her large gaps in treatment, her noncompliance, her apparent success with adherence to prescriptions, her admissions regarding her ability to work and motivations for disability benefits, and the functional observations of the consultative examiners, the undersigned finds the above-listed residual functional capacity assessment fully accounts for [Thornton's] obesity, diabetes mellitus, and associated neuropathy.

(Administrative Record at 19.)

Having reviewed the entire record, the Court finds that the ALJ properly considered Thornton's medical records, observations of treating and non-treating physicians, and Thornton's own description of her limitations in making his RFC assessment for

---

[8] *See* Administrative Record at 18-19 (providing thorough discussion of Thornton's medical history as it pertains to her diabetes, obesity, and neuropathy).

[9] Administrative Record at 18.

[10] *Id.* at 19.

[11] Administrative Record at 19.

22

Thornton.[12] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Thornton's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

## VI. CONCLUSION

The Court finds that the ALJ properly considered and addressed the medical evidence and opinions in the record, including the opinions of Dr. Rathe. The Court also finds that the ALJ made a proper RFC assessment for Thornton. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.

DATED this  6th  day of June, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[12] *See* Administrative Record at 18-19 (providing a thorough and detailed discussion of the relevant evidence for making a proper RFC determination as it relates to Thornton's neuropathy).